UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

CASE NO. 21-cv-24320-ALTMAN/REID

SECURITIES AND EXCHANGE COMMISSION,

    Plaintiff,

v.

ALEXANDER KON,

    Defendant.

_____/

**REPORT AND RECOMMENDATION ON PLAINTIFF, SECURITIES AND EXCHANGE COMMISSION'S MOTION FOR ENTRY OF FINAL JUDGMENT**

This cause is before the Court upon Plaintiff, Securities and Exchange Commission's Motion for Entry of Final Judgment Against Defendant Alexander Kon. [ECF No. 27]. For the reasons discussed below it is **RECOMMENDED** that the Motion be **GRANTED in part**.

**BACKGROUND**

In 2016, Defendant, Alexander Kon, became the subject of a Securities and Exchange Commission ("SEC") administrative cease-and-desist proceeding (the "2016 Action"). *Alexander Kon*, Securities Act Rel. No. 10252, 2016 WL 66785621 (Nov. 14, 2016). The proceeding centered around Defendant's violations of Section 17(b) of the Securities Act of 1933, 15 U.S.C. § 77q(b), in which he misstated the source of compensation he received in exchange for promoting a microcap "penny" stock. Specifically, Defendant was said to own email lists and websites through which he would promote penny-stocks, often with the help of other promoters. [ECF No. 1 at ¶ 7]. In 2014, Defendant promoted a penny-stock company supposedly active in the medical marijuana industry. [*Id.* at ¶ 8]. In his promotion materials, Defendant disclosed he had received $25,000

1

from a "third party" to tout the stock. [*Id.*]. In reality, Defendant had received this compensation directly from the issuer. [*Id.*]. In response, the SEC initiated the 2016 Action.

The 2016 Action ultimately settled in 2018, with Defendant agreeing to an administrative order under which he would be suspended from participating in any offerings of penny-stocks for a twelve-month period, which was to begin on May 30, 2018. [ECF No. 27 at 2–3]. As part of the settlement, Defendant was also required to pay disgorgement, prejudgment interest, and civil penalties. [*Id.* at 3]; *Alexander Kon*, Securities Act Rel. No. 10501, 2018 WL 2411767 (May 29, 2018).

In September 2019, the SEC began an investigation into whether Defendant had violated the 2018 Order by participating in penny-stock offerings. [ECF No. 27 at 3]. The investigation uncovered that Defendant had violated the terms of the 2018 Order by recruiting other promoters to tout penny-stocks through a company he formed. [ECF No. 27-1 at 13]. Defendant founded World Wide Media Group LLC ("World Wide") on May 12, 2016. [*Id.*]. Defendant opened a bank account for World Wide with Wells Fargo Bank, N.A., and was listed as the sole signatory on the account. [*Id.* at 16–17]. He also listed the company's annual gross sales as $1,100,000.00. [*Id.* at 17]. Much of the company's operations included the promotion of penny-stocks. [*Id.* at 24–25].

The day before the May 30, 2018, suspension period was to begin, Defendant "transitioned the stock promotion aspect of the business to Jayson Aguilar, a Philippines-based individual who in the past had performed web development and programming services for World Wide unrelated to stock promotion." [ECF No. 27 at 6]. Defendant purports to have signed a document relinquishing his responsibilities and management of the penny-stock promotion aspect of World Wide to Aguilar. [*Id.*]. Aguilar was given access to Defendant's "Skype" and "Viber" accounts which served as World Wide's primary method of communication. [*Id.*]. Additionally, Aguilar

was given access to World Wide's bank accounts, which was used for penny-stock promotions. [*Id.*]. Throughout Aguilar's operation of World Wide's penny-stock promotions, Defendant continued to have access to World Wide's debit card, which he used for business expenses as well as personal spending, and to the corporation's online accounts. [*Id.* at 7].

Plaintiff alleges during the course of its investigation regarding Defendant's violation of the terms of his 2018 suspension, he did not comply with various SEC issued subpoenas seeking testimony and documents. [*Id.*]. Consequently, on August 30, 2021, Plaintiff filed an application in this district seeking an order compelling Defendant to comply with the investigative subpoenas. [*Id.*]; *SEC v. Kon*, No. 1:21-mc-23129-KMW (S.D. Fla.). Ultimately, in the subpoena enforcement action, the court ordered Defendant to comply with the subpoenas. [ECF No. 27 at 3]. On October 8, 2021, however, the SEC informed the court that Defendant had submitted an offer to anticipatorily settle any case the SEC would bring against him for violating the 2018 Order. [*Id.*].

Plaintiff accepted Defendant's offer to settle and filed the instant action on December 14, 2021. [ECF No. 1]. Pursuant to this agreement, Plaintiff filed a proposed consent judgment, in which Defendant agreed to a permanent ban on penny-stock offerings, as well as payment of disgorgement, prejudgment interest, and a civil penalty. [ECF No. 4-2]. The amounts were to be determined by the Court. [*Id.*]. The Court entered the consent judgment on December 16, 2021, [ECF No. 5], and set deadlines for the parties to conduct discovery and brief the monetary relief issues. [ECF Nos. 8; 25]. The instant Motion followed.

## **DISCUSSION**

Defendant should be required to pay disgorgement and prejudgment interest in the amounts Plaintiff seeks because he has failed to rebut Plaintiff's reasonable approximation of his net profits.

Plaintiff's suggested civil penalty, however, is excessive and should be reduced for the reasons addressed below.

## I. The Disgorgement Issue

The crux of the dispute surrounding Plaintiff's Motion involves the propriety of disgorgement in this case. The resolution to this dispute hinges on the parties' contention of whether 15 U.S.C. § 78u(d)(5) and recent United States Supreme Court decision, *Liu v. SEC*, 140 S. Ct. 1936 (2020), applies in this case, or whether § 78u(d)(7) does. Consequently, the nuances of the parties' position on this issue requires careful explanation.

At the outset, it must be noted that both parties' arguments regarding disgorgement center in large part around *Liu*. Defendant's argument, however, misconstrues *Liu*'s application to the instant case. So, we will begin with a brief explanation of what *Liu* did and did not say.

In *Liu*, the Court sought to clarify "whether, and to what extent, the SEC may seek 'disgorgement' … through its power to award 'equitable relief' under 15 U.S.C. § 78u(d)(5)." *Id.* at 1940. The central holding in *Liu* reaffirmed that the SEC may seek disgorgement in civil proceedings for securities violations, but that the amount awarded may not exceed a defendant's net profits. *Id.* at 1940. This is hardly controversial. The more nuanced portion of the decision, however, and what the parties focus on here, are the limitations placed on the SEC's ability to seek disgorgement by the statutory language authorizing such action, and the equitable principles the statue invokes. Section 78u(d)(5) in pertinent part provides: "In any action or proceeding brought or instituted by the Commission under any provision of the securities law, … any Federal court may grant … any equitable relief that may be appropriate or necessary *for the benefit of investors*." 15 U.S.C. § 78u(d)(5) (emphasis added).

Noting that Congress failed to "define what falls under the umbrella of 'equitable relief,'" under § 78u(d)(5), the Court embarked on a lengthy exposition on the history of equity. *Liu*, 140 S. Ct. 1942. The Court extracted two principles from the exposition that will suffice here: (1) "equity practice long authorized courts to strip wrongdoers of their ill-gotten gains;" and (2) "to avoid transforming an equitable remedy into a punitive sanction, courts restricted the remedy to an individual wrongdoer's net profits to be awarded *for victims*." *Id.* (emphasis added). The Court explained that since § 78u(d)(5)'s enactment courts have at times awarded disgorgement in ways "that test the bounds of equity practice … [including] by ordering the proceeds of fraud to be deposited in Treasury funds instead of disbursing them to victims." *Id.* at 1946. The Court further explained that the SEC did not always return the entirety, or any, of the disgorgement proceeds to investors. *Id.* at 1947. Rather, in the years since § 78u(d)(5)'s emergence, the SEC had embarked on a practice of depositing the disgorgement proceeds, in whole or in part, in a Congressionally established fund in the Treasury. *Id.*

Reconciling that practice with § 78u(d)(5)'s "for the benefit of the investors" language, the Court acknowledged the "statute provides limited guidance as to whether the practice of depositing a defendant's gains with the Treasury satisfies the statute's command that any remedy be 'appropriate or necessary for the benefit of the investors.'" *Id.* at 1947–48. Rejecting the SEC's argument that "the primary function of depriving wrongdoers of profits is to deny them the fruits of their ill-gotten gains," the Court explained that the "equitable nature of the profits remedy generally requires the SEC to return a defendant's gains to wronged investors for their benefit." *Id.* at 1948. As such, the Court reasoned "the SEC's equitable, profits-based remedy must do more than simply benefit the public at large by virtue of depriving the wrongdoer of ill-gotten gains. To hold otherwise would render meaningless the latter part of § 78u(d)(5)." *Id.*

The question surrounding "the SEC's practice of depositing disgorgement funds with the Treasury … where it is *infeasible* to distribute the collected funds to investors," however, remained. *Id.* The Court acknowledged that "[i]t is an open question whether, and to what extent, that practice nevertheless satisfies the SEC's obligation to award relief 'for the benefit of investors' and is consistent with the limitations of § 78u(d)(5)." *Id.* The Court declined to answer the question. *Id.* at 1948–49. Instead, it directed that if confronted with such a situation, the lower courts being "equipped to evaluate the feasibility of returning funds to victims of fraud," should address the situation, as well as the adequacy of the SEC's attempt to return the disgorgement funds to investors. *Id.* at 1948 n. 5 (citing *SEC v. Lund*, 570 F. Supp. 1397, 1404–05 (C.D. Cal. 1983)).

Here, Defendant argues we are confronted with that situation exactly. Plaintiff is seeking disgorgement funds pursuant to the consent decree. *See generally* [ECF No. 27]. Plaintiff claims "that the effect of Kon's violation are so broad and diffuse that distributing *any* amount to investors is infeasible," and therefore, the disgorgement funds should be deposited into the Treasury. [ECF No. 33 at 10]. Given the alleged infeasibility, Plaintiff argues doing so would in no way conflict with *Liu* or § 78u(d)(5). [ECF No. 27 at 10 n. 23]. Defendant contends that Plaintiff is impermissibly attempting "to unshackle disgorgement from its equitable roots," and to pocket the disgorgement funds instead of distributing it to the victims. [ECF No. 30 at 10–16]. Therefore, Defendant argues, Plaintiff's request is irreconcilable with § 78u(d)(5)'s "for the benefit of the investors" language, *Liu*, and traditional notions of equity. [*Id.*]. Defendant's argument, however, misses the mark for a very simple reason. It applies the wrong statutory provision.

Despite the majority of the parties' briefing focusing on *Liu* and § 78u(d)(5), that provision does not apply here. Rather § 78u(d)(7) controls. After the *Liu* decision was issued, Congress

6

amended the Exchange Act, and pertinently, added two new provisions. First Congress added § 78u(d)(3)(A)(ii), which provides: "Whenever it shall appear to the Commission that any person has violated any provision of the chapter …. The Commission may bring an action in a United States district court to seek, and the courts shall have jurisdiction to-- … require disgorgement under paragraph (7) of any unjust enrichment by the person who received such unjust enrichment as a result of such violation." 15 U.S.C. § 78u(d)(3)(A)(ii). Crucially, for our purposes, paragraph 7 titled 'Disgorgement," to which § 78u(d)(3)(A)(ii) refers, states that: "In any action or proceeding brought by the Commission under any provision of the securities laws, the Commission may seek, and any Federal court may order, disgorgement." 15 U.S.C. § 78u(d)(7).

Notably, 78u(d)(5)'s "for the benefit of the investor" language is nowhere to be found in 78u(d)(7). As Plaintiff notes "'[i]t is generally presumed that Congress acts intentionally and purposely when it includes particular language in one section of a statute but omits it in another …' and that presumption is even stronger when the omission is made just months after a Supreme Court decision identifying that particular language as a limitation or restriction." [ECF No. 33 at 4] (quoting *Chicago v. Envtl. Def. Fund*, 511 U.S. 328, 338 (1994)). Defendant, on the other hand, argues that § 78u(d)(5) and *Liu* still control because the 2021 amendments did not redefine disgorgement and convert it into a new non-equitable remedy. [ECF No. 30 at 14]. Rather, Defendant contends Congress enacted the amendment solely to: "(1) extend the statute of limitations for disgorgement to ensure the SEC could remedy long-term—and well concealed—fraud; and (2) reject challenges that the SEC wasn't entitled to seek disgorgement **at all**.[1]" [*Id.*] (emphasis in original). Thus, Defendant avers, disgorgement remains "tethered" to equitable

---

[1] Presumably, Defendant is implicitly referring to Justice Thomas's dissenting opinion in *Liu*, in which he argued that disgorgement can never be awarded under 15 U.S.C. § 78u(d)(5) because it was not "a traditional equitable remedy" at common law, and is thus not "equitable relief" authorized under the statute. *See generally Liu*, 140 S. Ct. at 1950–56 (Thomas, J., dissenting).

7

principles (and presumably *Liu*'s interpretation thereof), and that Congress did not "silently deprive[] the public of a remedy intended to flow directly to those aggrieved—not the government," and permit the SEC to "pocket" disgorgement funds. [*Id.* at 15–16].

Defendant's argument fails. First, contrary to Defendant's argument, Congress was not silent. It explicitly chose, following *Liu*, to include disgorgement as a specified remedy—separate from the provision titled "Equitable Relief"—under which the SEC may seek disgorgement. Second, the choice to exclude the "for the benefit of the investor" language is telling. The plain language of the statute, and just as importantly the missing language, permits the SEC to seek disgorgement of "any unjust enrichment." *See* 15 U.S.C. §§ 78u(d)(3)(A)(ii); 78u(d)(7). Unlike with § 78u(d)(5), this need not be done for the benefit of the investor. As Plaintiff notes, Congress' choice to codify disgorgement as a separate remedy, but to do so without incorporating § 78u(d)(5)'s "for the benefit of the investors" language, is to be construed as an intentional omission. Thus, the plain language of the statute permits disgorgement even where it is not done for the benefit of investors, but merely to deprive a defendant of his ill-gotten gains.

This understanding of § 78u(d)(7) does not untether disgorgement from its equitable origins. Congress chose to couch the new disgorgement provision in terms of "unjust enrichment." 15 U.S.C. 78u(d)(3)(A)(ii). Unfortunately, unjust enrichment is a notoriously difficult term of art to attach an exact meaning to. *See* Restatement (Third) of Restitution and Unjust Enrichment § 1 cmt. a (Am. Law. Inst. 2011) (noting "[i]t is by no means obvious, as a theoretical matter, how 'unjust enrichment' should best be defined"). We do know, however, that it is an equitable remedy, and a creature of restitution. At a minimum, unjust enrichment, particularly as used in § 78u(d)(3)(A)(ii), is a remedy designed to prevent a wrongdoer from keeping the fruits of his wrongdoing. Even where the victims or investors do not receive the benefit of the wrongdoer's

misdeeds upon disgorgement, it is in line with traditional notions of equity that the wrongdoer not maintain them. *See In re Processed Egg Prod. Antitrust Litig.*, 851 F. Supp. 2d 867, 916 n. 50 (E.D. Pa. 2012) (collecting cases and noting that under a specific state's interpretation "[u]njust enrichment is an essentially equitable doctrine requiring proof of some misconduct, fault of culpable action on the part of the defendant as 'wrongdoer' which renders his retention of a benefit at the expense of another contrary to equity and good conscience"). Further, § 78u(d)(7) also conforms with equity practice because it is not punitive in the same manner as a civil penalty. The clearest example of this is that disgorgement may not exceed a defendant's net profits, and therefore merely seeks to prevent a wrongdoer from profiting from their misdeeds. Although this Court shares Defendant's concerns that the SEC, and the not the investors, shall receive the disgorgement funds, this outcome is mandated by the plain language of the statute and does not offend equitable principles.

Further, Defendant's argument fails because as part of the consent decree, he agreed to "pay disgorgement of ill-gotten gains, prejudgment interest thereon, and a civil penalty pursuant to … 15 U.S.C. § 78u(d)(3)[]." [ECF No. 5 at 2]. By agreeing to accountability under § 78u(d)(3), which explicitly permits Plaintiff to seek disgorgement under § 78u(d)(7), Defendant bound himself to that provision, and not § 78u(d)(5). Consequently, disgorgement, even if paid to the Treasury instead of investors, is appropriate here.

Lastly, to this Court's knowledge only one Court has comprehensively addressed the issues discussed above, after § 78u(d)(7)'s introduction. Under similar facts, the court came to the same conclusion we have here. In *SEC v. Spartan Sec. Grp., Ltd.*, the court found that "because the newly added provisions of the NDAA are silent on the question of whether funds must be returned to investors – i.e., because subsections (d)(3) and (7) do not contain the 'for the benefit of investors'

9

language that is included in subsection (d)(5) – the SEC need not show that disgorgement is for 'the benefit of investors' and, thus, disgorgement to the Treasury is appropriate." --- F. Supp. 3d ---, No. 8:19-CV-448-VMC-CPT, 2022 WL 3224008, at *9 (M.D. Fla. Aug. 10, 2022). As such, the court, rejecting the same arguments Defendant makes here, held "that it may order disgorgement and direct that disgorged funds be sent to the Treasury under Section 78u(d)(7)." *Id.* Additionally, the court found even if it were "(post-NDAA) still required to balance the equities under *Liu*, the equities [] weigh in favor of disgorgement to the Treasury," rather than permitting the defendant to retain its ill-gotten gains. *Id.* at 9–10.

Having determined disgorgement is appropriate, we now must address what the disgorgement amount should be. "The SEC is entitled to disgorgement upon producing a reasonable approximation of a defendant's ill-gotten gains…. [e]xactitude is not a requirement so long as the measure of disgorgement is reasonable, any risk of uncertainty should fall on the wrongdoer whose illegal conduct created that uncertainty." *SEC v. Calvo*, 378 F.3d 1211, 1217 (11th Cir. 2004) (internal quotation marks and citation omitted). Once the SEC has made such a showing, "[t]he burden then shifts to the defendant to demonstrate that the SEC's estimate is not a reasonable approximation." *Id.* (citation omitted).

Here, Defendant contends the SEC's disgorgement figure of $585,960 is excessive and is not a reasonable approximation of Defendant's net profits. Defendant argues Plaintiff failed to subtract "$424,074 of debits … paid to vendors," which constitute legitimate business expenses. [ECF No. 30 at 16–17]. Specifically, Defendant argues that Plaintiff included as net profits any and all credit items in the World Wide account Defendant could not account for because Jayson Aguilar, the individual Defendant attempted to hand his business off to, was running the business when these expenses were incurred. [*Id.*]. Notably, and as Plaintiff points out, the only evidence

10

Defendant has proffered to support this contention is his personal affidavit, the affidavit of Aguilar, and a spreadsheet attached thereto showing additional debits from World Wide's bank records. *See* [ECF No. 30-2]. In his affidavit, Aguilar contends that after reviewing the pertinent records the SEC has relied on in calculating its disgorgement figure, that there is no meaningful distinction between the work the vendors identified in the attachment to his affidavit performed and those vendors the SEC acknowledged constituted legitimate business expenses. [*Id.* at ¶¶ 3–5, 7].

Aside from the spreadsheet attached to Aguilar's affidavit, Defendant has produced no documentation to support his claim that Plaintiff's disgorgement figure is not a reasonable approximation of his ill-gotten gains. Even the spreadsheet attached to the Aguilar affidavit does not appear to be an official document, such as bank records, but rather, an unverified spreadsheet. This is insufficient. Defendant cannot be said to have carried his burden to show Plaintiff's disgorgement figure is not a reasonable approximation of Defendant's net profits.

## II.     Prejudgment Interest

At the outset, it must be noted that Defendant consented to pay prejudgment interest. *See generally* [ECF No. 5]. Further, in his Response to Plaintiff's Motion for Final Judgment, he did not specifically object to the amount Plaintiff seeks in prejudgment interest. Rather, he merely asserts that it should be adjusted to the amount of disgorgement this Court decides to award, if any. [ECF No. 30 at 18 n.15].

Given the recommendation that the disgorgement award should be Plaintiff's requested amount of $585,960, the prejudgment interest should stay the same as well. Plaintiff seeks $70,508.18 in prejudgment interest. [ECF No. 27 at 11]. The Undersigned finds no error in Plaintiff's calculation of the prejudgment interest. Plaintiff notes that "prejudgment interest on disgorgement generally is calculated based on the IRS underpayment rate, i.e., the delinquent tax

rate as established by the IRS … and assessed on a quarterly basis." [*Id.* at 10–11]; IRC §6621(a)(2). Plaintiff's calculations comport with these requirements. *See* [ECF No. 27-1 at 82]. Accordingly, $70,508.18 in prejudgment interest should be awarded.

### III.   Civil Penalty

Plaintiff is seeking a $250,000 civil penalty against Defendant. Plaintiff contends that this penalty is appropriate, regardless of which tier level is assigned to Defendant's misconduct, because the "penalty sought by the Commission is significantly below Kon's gross pecuniary gain." [ECF No. 27 at 11].

Section 78u(d)(3)(B) provides three tiers of penalties to be applied "for each violation" a Defendant commits. 15 U.S.C. § 78u(d)(3)(B). The statute provides:

(B) Amount of penalty

  (i) First tier

The amount of a civil penalty imposed under subparagraph (A)(i) shall be determined by the court in light of the facts and circumstances. For each violation, the amount of the penalty shall not exceed the greater of (I) $5,000 for a natural person or $50,000 for any other person, or (ii) the gross amount of pecuniary gain to such defendant as a result of the violation.

  (ii) Second tier

Notwithstanding clause (i), the amount of penalty for each such violation shall not exceed the greater of (I) $50,000 for a natural person or $250,000 for any other person, or (II) the gross amount of pecuniary gain to such defendant as a result of the violation, of the violation described in paragraph (A) involved fraud, deceit, manipulation, or deliberate or reckless disregard of a regulatory requirement.

  (iii) Third tier

Notwithstanding clauses (i) and (ii), the amount of penalty for each such violation shall not exceed the greater of (I) $100,000 for a natural person or $500,000 for any other person, or (II) the gross amount of pecuniary gain to such defendant as a result of the violation, if—

(aa) the violation described in subparagraph (A) involved fraud, deceit, manipulation, or deliberate or reckless disregard of a regulatory requirement; and

(bb) such violation directly or indirectly resulted in substantial losses or created a significant risk of substantial losses to other persons.

15 U.S.C. § 78u(d)(2)(B). Since the statute fails to define the term "violation," and given that district courts have "broad equitable power to fashion appropriate remedies," district courts have discretion to determine the number of violations a defendant has committed under the statute, and need not "track the SEC's litigation approach." *SEC v. Fowler*, 6 F.4th 255 (2d Cir.), *cert. denied*, 142 S. Ct. 590, 211 L. Ed. 2d 367 (2021) (rejecting the SEC's characterization of the defendant's conduct as a single scheme or violation because the defendant "selected his victims for this conduct individually"). In addition to the statutory requirements, courts look to a number of general factors when imposing penalties under Section 78u(d)(3)(B), including:

> (1) the egregiousness of the violation at issue; (2) defendants' scienter; (3) the repeated nature of the violations; (4) defendants' failure to admit to their wrongdoing; (5) whether defendants' conduct created substantial losses to other persons; (6) defendants' lack of cooperation and honesty with authorities, if any; and (7) whether the penalty that would otherwise be appropriate should be reduced due to defendants' demonstrated current and future financial condition.

*SEC v. Huff*, No. 08-60315-CIV, 2010 WL 148232, at *4 (S.D. Fla. Jan. 12, 2010) (citation omitted). Although a defendant's ability to pay is at most a factor to consider in imposing a penalty, and a defendant's inability to pay does not preclude imposing a civil penalty, a court may abuse its discretion in refusing to consider a fact that should be given significant weight. *SEC v. Warren*, 534 F.3d 1368, 1370 (11th Cir. 2008).

Here, Defendant asserts a $250,000 penalty is excessive. He argues his violations were "technical" and "not of the kind generally warranting a substantial penalty." [ECF No. 30 at 19]. Further, he argues he should only be subject to a "minimal" penalty because he did not act with a high degree of scienter, Plaintiff has not shown demonstrated losses to investors, and that he cooperated with the SEC through the consent judgment. [*Id.* at 19–22]. Lastly, Defendant avers he

13

lacks the ability to pay given his modest monthly income, liabilities such as a mortgage, and limited valuable assets. [*Id.* at 22–25]. Plaintiff counters by arguing that Defendant's violation was not merely "technical," rather his choice not to confer with an attorney about how to comply with the terms of his suspension was at least reckless. [ECF No. 33 at 14–15]. Additionally, Plaintiff argues that despite his assertions to the contrary, Defendant was uncooperative during the investigation, such that Plaintiff had to file various motions to corral Defendant into compliance. [*Id.* at 16].

The parties disagree over which tier is applicable to Defendant's conduct, if any. Plaintiff avers that determining which tier applies is merely an "academic" inquiry since Defendant's "gross pecuniary gain exceeds $250,000," and "all three tiers authorize a penalty based on [a defendant's] 'gross' pecuniary gain." [ECF No. 33 at 14]. In the alternative, Plaintiff contends if the Court were to consider which tier applies, it would be the second tier because Defendant "knowing of his impending penny-stock suspension, developed a plan to have Aguilar run the business from the Philippines through [Defendant's] wholly-owned company … [with Defendant] keep[ing] the profits other than a small amount paid to Aguilar." [*Id.* at 15].

Defendant argues further, that given the "obvious issues about whether this plan was consistent with the suspension," this conduct, and in particular Defendant's choice not to confer with an attorney about the same, at a minimum constitutes recklessness justifying application of the second tier. [*Id.*]. Defendant, on the other hand, argues only a single first tier penalty is appropriate because Plaintiff has not argued or introduced evidence showing Defendant's conduct was fraudulent, and at most his continued ownership of World Wide, and failure to consult with an attorney, was negligent. [ECF No. 30 at 25–26]. Further, Defendant argues that since Plaintiff has failed to adequately detail the "multiple violations" he committed, only a single first tier penalty is appropriate. [*Id.* at 26].

14

The Undersigned does not agree with Plaintiff's argument that no tier needs to be assessed. Notwithstanding, Plaintiff is correct that the second tier is appropriate here. Defendant's scheme following his suspension to maintain ownership of World Wide and profit from Aguilar's operation of it, taken by itself, strongly supports the argument that such conduct is reckless. To do so without consulting with an attorney, however, certainly constitutes reckless disregard of regulatory requirements. Therefore, the second tier is applicable here. *See* 15 U.S.C. § 78u(d)(3)(B)(ii). Yet, this Court also has an obligation to consider the surrounding facts and circumstances of the case, including Defendant's current financial condition. Despite Plaintiff's arguments regarding Defendant's supposed recalcitrance during this case, Defendant has cooperated with the SEC and, if only tacitly, has acknowledged his wrongdoing. This is clearly evidenced by the consent judgment. Defendant's underlying conduct, while more than a mere "technicality" was not particularly egregious, and did not involve fraud or similar misconduct. Additionally, there is no indication, nor does Plaintiff contend, Defendant's conduct resulted in substantial losses to investors. Further, Defendant has demonstrated his current financial situation, such as being on a fixed monthly income, coupled with his exclusion from the future penny-stock trading, renders it quite unlikely he has the ability to pay a $250,000 civil penalty.

Consent judgments save the court, the parties, and the taxpayer, significant time and resources in adjudicating disputes. As such, they are looked upon favorably by courts, and where possible and appropriate, should be encouraged. Defendant chose to cooperate. This fact, along with those previously mentioned, militate in favor of imposing an equitable penalty. *See SEC v. Richards*, No. 1:13-CV-1729-WBH, 2014 WL 11822762, at *2 (N.D. Ga. Aug. 26, 2014) (reducing civil penalty on a third tier penalty by one third given the defendant's financial condition and because he had admitted liability and was generally cooperative with the SEC). Here, Plaintiff,

despite Defendant's cooperation, is in essence looking to throw the book at Defendant. Plaintiff is correct that "civil penalties are intended to punish the individual wrongdoer and to deter him and others from future securities violations." *SEC v. Monterosso*, 756 F.3d 1326, 1338 (11th Cir. 2014). There are, however, instances where punishment should be proportional not only to the underlying misdeeds, but also to a wrongdoer's choice to take accountability for those misdeeds. This is such an instance.

Section 78u(d)(3)(B)(ii) allows for courts either to assess a penalty based on "the gross amount of pecuniary gain" a defendant obtained because of their securities violations, as Plaintiff requests, *or* a $50,000[2] penalty (for a natural person) for each violation committed. *See* 15 U.S.C. § 78u(d)(3)(B)(ii). The latter approach is appropriate here. Assessing a penalty based on the second tier would serve to punish Defendant, and deter him and others from committing future securities violations. Doing so would also be proportional to Defendant's misconduct, account for his cooperation in entering into the consent judgment, and would encourage those similarly situated individuals to potentially do the same in the future.

Next, we must determine how many "violations" Defendant committed in assessing the second tier penalty. Plaintiff contends "[t]he court should treat each separate stock promoted as a separate violation … [and that] it is fair to infer that each separate payor to Kon represents at least one such stock, and there are at least four such payors." [*Id.* at 16]. Thus, Plaintiff reasons, "[g]iven the more than 40 separate payments by one of the payors over the course of the entire suspension period, four is undoubtedly an undercount." [*Id.* at n.10]. The better approach, however, would be to consider Defendant's conduct during the suspension period as a single violation. As Plaintiff acknowledges, given the lack of record evidence in this case, it is difficult to pinpoint with certainty

---

[2] It must be noted that penalty amounts are adjusted for inflation, and thus the $50,000 allotted for in the statute is currently $103,591. *See* [ECF No. 33 at 16 n. 9] (citing SEC Release No. 33-11021].

16

the number of individual stock promotions Aguilar advanced on World Wide's behalf. As this number is something of a moving target, and that Defendant's choice to allow Aguilar to operate World Wide on his behalf during the suspension period was a singular decision, treating this as a single violation under the statute is logical and practical. A $103,591 penalty, however, is still excessive. A reasonable civil penalty would be the $50,000 originally contemplated by the statute. As discussed, this would deter future misconduct, would represent a figure Defendant likely would be able to pay, and takes into consideration Defendant's choice to enter into a consent judgment.

## CONCLUSION

For the foregoing reasons, it is **RECOMMENDED** that Plaintiff's Motion for Entry of Judgment [ECF No. 27], be **GRANTED in part**, and that:

1. Defendant pay $585,960.00 in disgorgement;
2. Defendant pay $70,508.18 in prejudgment interest; and
3. Defendant pay a $50,000.00 civil penalty for his misconduct.

Objections to this Report may be filed with the district judge within fourteen days of receipt of a copy of the Report. Failure to timely file objections will bar a *de novo* determination by the district judge of anything in this Report and shall constitute a waiver of a party's "right to challenge on appeal the District Court's order based on unobjected-to factual and legal conclusions." 11th Cir. R. 3-1; *see also Harrigan v. Metro-Dade Police Dep't Station #4*, 977 F.3d 1185, 1191-92 (11th Cir. 2020); 28 U.S.C. § 636(b)(1)(C).

**SIGNED** this 22nd day of August, 2022.

_____
LISETTE M. REID
UNITED STATES MAGISTRATE JUDGE

cc: **U.S. District Judge Roy K. Altman;**

**All Counsel of Record**