IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF FLORIDA

CASE NO.: 1:21-cv-24320-RKA

**SECURITIES AND EXCHANGE COMMISSION**,

    *Plaintiff*,

v.

**ALEXANDER KON**,

    *Defendant.*
_____/

## **ORDER**

Our Plaintiff, the Securities and Exchange Commission, filed a Motion for Entry of Final Judgment against our Defendant, Alexander Kon (the "Motion") [ECF No. 27].[1] We referred the Motion to U.S. Magistrate Judge Lisette M. Reid for a Report and Recommendation (the "R&R"). *See* Order Referring the Motion [ECF No. 29]. In her R&R, Magistrate Judge Reid recommended that we grant the Motion *in part*, and that we order Kon to pay (a) $585,90.00 in disgorgement; (b) $70,508.18 in prejudgment interest; and (c) a $50,000 civil penalty. *See* R&R [ECF No. 35] at 17.

The R&R also cautioned the parties as follows:

> Objections to this Report may be filed with the district judge within fourteen days of receipt of a copy of the Report. Failure to timely file objections will bar a *de novo* determination by the district judge of anything in this Report and shall constitute a waiver of a party's "right to challenge on appeal the District Court's order based on unobjected-to factual and legal conclusions." 11th Cir. R. 3-1; *see also Harrigan v. Metro-Dade Police Dep't Station #4*, 977 F.3d 1185, 1191–92 (11th Cir. 2020); 28 U.S.C. § 636(b)(1)(C)

*Ibid.* Both parties filed timely objections. *See* the SEC's Objections to the R&R ("SEC Obj.") [ECF

---

[1] That Motion was fully briefed. *See* Kon's Response in Opposition to the Motion for Final Judgment ("Kon's Response to the Motion") [ECF No. 30]; the SEC's Reply in Support of the Motion for Final Judgment ("the SEC's Reply") [ECF No. 33].

No. 36]; Kon's Objections to the R&R ("Kon Obj.") [ECF No. 37].[2] Having reviewed the R&R and the Objections, we now **ADOPT in part** the R&R and **GRANT in part** the SEC's Motion.

## THE LAW

When a magistrate judge's "disposition" has been objected to, district courts must review that disposition *de novo*. FED. R. CIV. P. 72(b)(3). But, when no party has timely objected, "the court need only satisfy itself that there is no clear error on the face of the record in order to accept the recommendation." FED. R. CIV. P. 72 advisory committee's notes (citation omitted). Although Rule 72 itself is silent on the standard of review, the Supreme Court has acknowledged that Congress's intent was to require a *de novo* review only where objections have been properly filed—and not when neither party objects. *See Thomas v. Arn*, 474 U.S. 140, 150 (1985) ("It does not appear that Congress intended to require district court review of a magistrate [judge]'s factual or legal conclusions, under a *de novo* or any other standard, when neither party objects to those findings."). In any event, the "[f]ailure to object to the magistrate [judge]'s factual findings after notice precludes a later attack on these findings." *Lewis v. Smith*, 855 F.2d 736, 738 (11th Cir. 1988) (citation omitted).

## ANALYSIS

### I.   Disgorgement

Kon agrees that he must pay *some* disgorgement. *See* Kon Obj. at 4. But he objects to the *amount* the R&R recommended because he insists that we should "modify the judgment and reduce the amount of disgorgement to $161,886." *Ibid.* In saying so, Kon doesn't quibble with the SEC's "reasonable approximation of [his] ill-gotten gains." *SEC v. Levin*, 849 F.3d 995, 1006 (11th Cir. 2017); *see also* Kon. Obj. at 4 (not disputing the amount of his ill-gotten gains). Instead, he contends that he's proven up "an additional $424,074 in legitimate business expenses that should be deducted from any

---

[2] The parties also responded to each other's objections. *See* the SEC's Response to Kon's Objections [ECF No. 38]; Kon's Response to the SEC's Objections [ECF No. 39].

2

disgorgement order." Kon Obj. at 12. We disagree.

"Disgorgement is an equitable remedy intended to prevent unjust enrichment." *Levin*, 849 F.3d at 1006. The SEC bears the initial burden of proffering a "reasonable approximation of the defendant's ill-gotten gains," *ibid.*, and "[e]xactitude is not a requirement," *S.E.C. v. Monterosso*, 756 F.3d 1326, 1337 (11th Cir. 2014). "Once the SEC has produced a reasonable approximation of the defendant's unlawfully acquired assets, the burden shifts to the defendant to demonstrate the SEC's estimate is not reasonable." *Ibid.* "So long as the measure of disgorgement is reasonable, any risk of uncertainty should fall on the wrongdoer whose illegal conduct created that uncertainty." *SEC v. Calvo*, 378 F.3d 1211, 1217 (11th Cir. 2004) (quoting *SEC v. Warde*, 151 F. 3d 42, 50 (2d Cir. 1998)).

"[C]ourts must deduct legitimate expenses before ordering disgorgement under § 78u(d)(5)," *Liu v. SEC*, 140 S. Ct. 1936, 1950 (2020), and "may not enter disgorgement awards that exceed the gains 'made upon any business or investment, when both the receipts and payments are taken into the account,'" *ibid.* (quoting *Providence Rubber Co. v. Goodyear*, 76 U.S. 788, 804 (1869)). If a defendant tries to show that he made additional legitimate business expenses beyond those the SEC has accounted for in its approximation, he must "provide concrete and credible evidence to demonstrate the amount of money spent on any of the alleged business expenses or whether any of the business expenses were legitimate." *CFTC v. Tayeh*, 848 F. App'x 827, 830 (11th Cir. 2021); *see also SEC v. Fowler*, 6 F.4th 255, 267 (2d Cir. 2021) (noting that the defendant bears the burden "to identify any additional 'legitimate' business expenses that, consistent with *Liu*, should have been deducted from an otherwise reasonable disgorgement amount"). But, "where a defendant's record-keeping or lack thereof has so obscured matters that calculating the exact amount of illicit gains cannot be accomplished without incurring inordinate expense, it is well within the district court's discretion to rule that the amount of disgorgement will be the more readily measurable proceeds received from the unlawful transactions." *Calvo*, 378 F.3d at 1217–18 (citing *CFTC v. Am. Bd. of Trade, Inc.*, 803 F.2d 1242, 1252 (2d Cir. 1986)).

The SEC based its computation of Kon's ill-gotten gains on "(a) the revenue World Wide received that Kon—its 100% owner—could neither account for nor document in any way, [$1,496,960.00], less (b) the amounts that appear to have been spent in furtherance of the penny stock promotion business [$36,000.00 paid to Kon's associate, Jayson Aguilar, and $875,000.00 of payments to third-party vendors]." Motion at 9. To determine which "legitimate business expenses" it should deduct from this sum, the SEC "review[ed] limited records with Kon under oath," SEC's Response to Kon's Objections at 2, examining "the list of disbursements on an item by item basis for the suspension period," *id.* at 5. The SEC ended up deducting every debit Kon (under oath) identified as a payment to a third-party vendor. *See id.* at 9 ("Indeed, in crediting Kon with every disbursement to an entity he recognized as a vendor—even when Kon could not testify or produce documentation of the purpose of those disbursements—the Commission made every possible concession or inference in favor of Kon.").

A few months later, however, as part of the briefing on this Motion—and long after discovery had closed—Kon asked the SEC to reduce his disgorgement amount even further. In support of this request, Kon now says he's identified—with Aguilar's help—an "additional $424,074 of debits World Wide paid to vendors." Kon's Response to the Motion at 17. To corroborate this claim, Kon has appended two documents: a declaration from Jayson Aguilar (who ran World Wide during the suspension), *see* Aguilar Declaration [ECF No. 30-2] at 1–2; and a spreadsheet of purported business expenses Aguilar attached to his declaration, *see* Aguilar's Exhibit A [ECF No. 30-2] at 4. And here's the rub: "Aguilar states [in his declaration] there is no meaningful distinction between the work the vendors identified in Exhibit A performed and those the SEC acknowledged constituted legitimate business expenses in [its] Exhibit 12." Kon's Response to the Motion at 17; *see also* Aguilar Declaration ¶ 4 ("Attached hereto as Exhibit A is a true and correct copy of additional debits from World Wide's bank records (Schiff Decl. Ex. 10) that weren't included as deductible business expenses by the SEC

4

(Schiff Decl. Ex. 12) but should have been. Added together, the debits total $424,074.").

Kon has failed to meet his burden of showing that "the SEC's estimate is not reasonable." *Monterosso*, 756 F.3d at 1337. To understand why, let's clarify what these various exhibits (Exhibit A, Exhibit 10, and Exhibit 12) *really* are. We'll start with Exhibit 10, which is a spreadsheet listing all of World Wide's banking transactions—both credits and debits—that exceeded $1,000.00, from May 2018 through May 2019.[3] *See* Schiff Declaration Exhibit 10 [ECF No. 27-1] at 67–75. Exhibit 12, by contrast—which identifies a subset of the transactions set out in Exhibit 10—highlights *only* the vendor payments the SEC identified (through Kon's sworn deposition testimony) as "legitimate business expenses."[4] *See* Schiff Declaration Exhibit 12 [ECF No. 27-1] at 79–80. And Exhibit A is a spreadsheet that, according Kon and Aguilar, "accurately reflected all payments from SEC Exhibit 10 not included on SEC Exhibit 12 as legitimate business expenses, but which should have been[.]" Kon Obj. at 12; *see also* Aguilar Declaration ¶ 4 (describing Exhibit A as "a true and correct copy of additional debits from World Wide's bank records that weren't included as deductible business expenses by the SEC . . . but should have been").

Kon, then, simply asks us to credit the Aguilar Declaration and Exhibit A and contends that, "if the Court orders disgorgement, the disgorged amount should not exceed $161,886, which is

---

[3] The parties agree that these are, in fact, World Wide's bank transactions. *See* Kon Obj. at 9–10 ("Exhibit 10 is a summary of all transactions into and out of World Wide's Wells Fargo account of $1000 or more, produced by Kon. In generating the summary, Kon's counsel relied upon the Wells Fargo account records produced during the SEC's investigation[.]"); Schiff Declaration at 2 (identifying Exhibit 10 as "[a] [s]preadsheet of World Wide Bank Account Activity (PDF conversion of Excel document produced by Kon in discovery)").

[4] The parties also agree that these are World Wide's vendor payments. *See* Kon Obj. at 10 ("Exhibit 12 is a summary of all payments to vendors that the SEC claimed should be deducted as legitimate business expenses, based upon Exhibit 10[.]"); Schiff Declaration at 2 (identifying Exhibit 12 as "[an] [e]xcerpt of World Wide Spreadsheet—Payments to Vendors (prepared by the undersigned) . . . . The vendors included are those that (a) received money from World Wide both during the suspension period, [and] (b) received money from World Wide in the five months prior to the suspension period, if Kon testified that the purpose of the pre-suspension payment were for stock promotion services.").

calculated as the $1,496,960 in 'estimated . . . gross revenue from penny stock promotion,' less the $911,000 in legitimate business expenses acknowledged by the SEC, and also less the $424,074 in legitimate business expenses identified in the Aguilar Declaration[.]" Kon's Response to the Motion at 18. For three reasons, we won't do that.

*First*, we won't blindly accept the veracity of either the Aguilar Declaration or Exhibit A. Kon's right (of course) that a person outside of the United States *may* validly attest to a declaration by writing something to the effect of: "I declare (or certify, verify, or state) under penalty of perjury under the laws of the United States of America that the foregoing is true and correct." 28 U.S.C. § 1746(1); *see also* Kon Obj. at 14 ("Here, Aguilar provided the proper attestation on page 2 of his declaration, acknowledging that he understands that he signed his declaration under penalty of perjury, pursuant to United States laws."). But that doesn't mean we must accept the *credibility* of that declaration. Aguilar is, to put it plainly, entirely unknown to us. He's not a party to this litigation. He hasn't produced documents or written discovery. He hasn't testified under oath—either at a deposition or in our courtroom—and he hasn't been subject to cross-examination. What's worse, by virtue of being Kon's business associate, he *may* have an interest in the outcome of this case. And an untested, unknown, unproven declarant simply isn't the kind of "concrete and credible evidence" a party needs "to demonstrate the amount of money spent on any of the alleged business expenses or whether any of the business expenses were legitimate." *Tayeh*, 848 F. App'x at 830.

*Second*, we refuse to reward Kon for obstructing the discovery process. During discovery, the SEC asked Kon for "[a]ll documents related to any expenses incurred by Kon or World Wide between May 30, 2018 and May 30, 2019, in connection with touting or otherwise promoting penny stocks," and requested "[a]ll documents [Kon] intend[s] to rely on in connection with the Court's determination in this case of the issues of disgorgement, prejudgment interest, and civil penalties." Plaintiff's Request for Production of Documents [ECF No. 13-1] at 4–5. When Kon failed to timely

6

respond to these requests, the SEC moved to compel his answers. *See* SEC's Motion to Compel [ECF No. 13]. After a hearing, U.S. Magistrate Judge Lisette M. Reid granted the SEC's motion, found that "[a]ll objections to Plaintiff's Request have been waived by Defendant's failure to timely respond to the Request," and ordered Kon to produce "all responsive documents" by April 11, 2022. Order Granting Motion to Compel [ECF No. 18] at 1. Kon complied with Magistrate Judge Reid's order and produced his documents on April 11, 2022. *See* Kon's Responses to the SEC's First Set of Requests for Production of Documents [ECF No. 33-2]. But, in response to the SEC's request for "all documents related to any expenses," Kon produced *only* bank statements and said that, "[i]f any responsive documents are missing, it is because . . . the documents either never existed or are not in Responding Party's possession, custody or control." *Id.* at 11–12. In other words, Kon was pellucid that, beyond the bank statements he'd already turned over, *he had no other evidence* to support any further business-expenses reduction. Indeed, to the request for "all documents you intend to rely on in connection with the Court's determination in this case of the issues of disgorgement, prejudgment interest, and civil penalties," Kon responded: "To the extent the documents are in Responding Party's possession, custody or control, they will be produced." *Id.* at 13.

It's undisputed, though, that he produced nothing more than those bank statements[5] and that he *didn't* produce *either* the Aguilar Declaration *or* Exhibit A until he attached those documents to his Response. The SEC therefore left discovery—and entered the final briefing stage of this case—believing that it had all the evidence it needed to calculate the full amount of Kon's disgorgement obligation. Two months later, however, Kon surfaced with the Aguilar Declaration—which (conveniently) reduces his disgorgement obligation by *more than 70%*. And the best part—from Kon's perspective—is that it accomplishes all this without allowing the SEC to test any of Aguilar's

---

[5] To be completely fair, the SEC tells us that Kon produced "a single invoice" in addition to the bank statements. SEC Reply at 11 n.6.

7

assertions. Again, since discovery has long closed, the SEC cannot depose Aguilar, cannot propound written discovery on him, and cannot subpoena (or depose) any third parties to verify any of the things Aguilar says. We just all have to take this man we've never seen or heard from before—who, by the way, lives in a foreign country and is thus beyond the reach of our contempt power—at his word. To accept Aguilar's statement in this way would be to encourage every future litigant to do exactly what Kon has done: feign total ignorance during discovery and then show up, *deus ex machina*, at the briefing stage with the crucial foreign affidavit that ends up reducing the disgorgement figure by seventy, eighty, even a-hundred percent. We won't be part of that game.

*Third*, the Eleventh Circuit has been clear that "any risk of uncertainty should fall on the wrongdoer whose illegal conduct created that uncertainty." *Calvo*, 378 F.3d at 1217. Because any remaining uncertainty is the result of Kon's violation of his previous suspension, his shady business practices, and his failure to produce responsive records during discovery, Kon (and not the SEC) should bear the risk of that uncertainty.

We thus **ADOPT** the R&R on this issue and **GRANT** the SEC's Motion. Kon shall pay $585,960.00 in disgorgement.

**II.    Prejudgment Interest**

The parties agree *both* that Kon must pay some prejudgment interest *and* that the formula for calculating that interest should be based on the IRS's delinquent tax rate and tied to the disgorgement amount; they thus disagree only on what that disgorgement amount should be. *See* Motion at 11 ("In Commission cases, prejudgment interest on disgorgement generally is calculated based on the IRS underpayment rate, i.e., the delinquent tax rate as established by the Internal Revenue Service, IRC § 6621(a)(2), and assessed on a quarterly basis."); Kon's Response to the Motion at 18 (noting only that "[t]he SEC's prejudgment interest calculations should likewise be adjusted to reflect the correct disgorgement amount, whether it be $1 or $161,886"). Now that we've resolved the disgorgement

amount, though, our work here is easy.

Prejudgment interest "helps assure that defendants do not profit from their fraud." *SEC v. Cook*, 2015 WL 5022152, at *28 (S.D. Ind. Aug. 24, 2015). The interest requirement therefore prevents the defendant from "obtaining the benefit of what amounts to an interest free loan procured as a result of illegal activity." Motion at 10 (citing *SEC v. Merchant Cap., LLC*, 486 F. App'x 93, 97 (11th Cir. 2012)). The district court has broad discretion to decide whether to impose prejudgment interest. *See SEC v. Hall*, 759 F. App'x 877, 883 (11th Cir. 2019). The court should calculate the amount of prejudgment interest by assessing the IRS underpayment rate (*i.e.*, the delinquent tax-interest rate), published at 26 U.S.C. § 6621(a)(2), on a quarterly basis. *See SEC v. First Jersey Sec., Inc.*, 101 F.3d 1450, 1476 (2d Cir. 1996); *SEC v. Huff*, 758 F. Supp. 2d 1288, 1364 (S.D. Fla. 2010) (Rosenbaum, Mag. J.) *aff'd on other grounds*, 455 F. App'x 882 (11th Cir. 2012). "The underpayment rate established under [§ 6621(a)(2)] shall be the sum of—(A) the Federal short-term rate determined under subsection (b), plus (B) 3 percentage points." 26 U.S.C. § 6221(a)(2). "The Federal short-term rate for any month shall be the Federal short-term rate determined during such month by the Secretary [of the Treasury] in accordance with section 1274(d). Any such rate shall be rounded to the nearest full percent (or, if a multiple of ½ of 1 percent, such rate shall be increased to the next highest full percent)." 26 U.S.C. § 6621(b)(3).

We therefore **ADOPT** this part of the R&R and **GRANT** this aspect of the SEC's Motion. Kon must pay prejudgment interest on the $585,960.00 we've ordered him to disgorge—calculated at the rate outlined in § 6621(a)(2)—for a total of $70,508.18.

### III.   Civil Penalty

Finally, the SEC objects to "the R&R's assessment of a $50,000 civil penalty." SEC Obj. at 2. It's the SEC's view that, "given the egregiousness of Kon's conduct, Kon's lack of cooperation in the Commission's investigation (requiring a subpoena enforcement action) and his recidivism," we should

9

"consider imposition of a higher penalty." *Ibid*. We agree—but only in part.

Section 21(d)(3)(B) of the Exchange Act, 15 U.S.C. § 78u(d)(3)(B), sets forth three tiers of civil penalties for violations of the Act.[6] Second-tier penalties are those that "involved fraud, deceit, manipulation, or deliberate or reckless disregard of a regulatory requirement." 15 U.S.C. § 78u(d)(3)(B)(ii). Under this second tier, "the amount of a civil penalty imposed . . . for each such violation shall not exceed the greater of (I) $50,000 for a natural person . . . or (II) the gross amount of pecuniary gain." *Ibid*. The Federal Civil Penalties Inflation Adjustment Act of 2015, though, *requires* that "the head of an agency *shall* adjust civil monetary penalties through an interim final rulemaking" as a first-time "catch up adjustment" to keep pace with inflation. Pub. L. No. 114-74, Sec. 701(b)(1)(D). The head of each agency must make this adjustment "not later than January 15 every year thereafter[.]" *Id*. § 701(b)(1)(A). The SEC's adjustment "sets forth the annual inflation adjustment of the maximum amount of civil monetary penalties ('CMPs') administered by the Commission under . . . the Securities Exchange Act of 1934 . . . effective beginning on January 15, 2022. . . [which] apply to all penalties imposed after that date for violations of the aforementioned statutes that occurred after November 2, 2015." Adjustments to Civil Monetary Penalty Amounts, 87 Fed. Reg. 1808 (Jan. 12, 2022). The SEC's adjustment notice includes a table, which tells us that the second-tier penalty under 15 U.S.C. § 78(u)(d)(3), adjusted for inflation in 2022, is $103,591.00. *Ibid*.

Remember, though, that the Exchange Act sets a penalty *ceiling* ("shall not exceed"), rather than a required amount. 15 U.S.C. § 78u(d)(3)(B)(ii). In other words, for each violation, we have the discretion to impose a civil penalty *up to* $50,000 (which, with interest, ends up being 103,591.00), or

---

[6] Magistrate Judge Reid suggested that we impose a second-tier penalty, and neither party has objected to that recommendation. *See* R&R at 15 ("Plaintiff is correct that the second tier is appropriate here."); *see generally* Kon Obj. (failing to object to the imposition of a second-tier penalty); *see also* SEC Obj. at 1 ("[T]he R&R correctly held that Kon's conduct warranted a second tier civil penalty[.]"). Finding no clear error in this part of the R&R, we now **ADOPT** it. *See* FED. R. CIV. P. 72 advisory committee's notes (requiring *de novo* review only of objected-to portions of an R&R).

*up to* the gross amount of Kon's pecuniary gain, using the following factors to guide our analysis:

> (1) the egregiousness of the violation at issue; (2) defendants' scienter; (3) the repeated nature of the violations; (4) defendants' failure to admit to their wrongdoing; (5) whether defendants' conduct created substantial losses to other persons; (6) defendants' lack of cooperation and honesty with authorities, if any; and (7) whether the penalty that would otherwise be appropriate should be reduced due to defendants' demonstrated current and future financial condition.

*SEC v. Huff*, 2010 WL 148232, at *4 (S.D. Fla. Jan. 12, 2010) (Rosenbaum, Mag. J.). The *Huff* factors support a civil penalty of $103,591.00 here.

*First*, the egregiousness of the violation. We agree with the Magistrate Judge that Kon's conduct wasn't particularly egregious. He wasn't actively involved in the business, and he wasn't personally promoting or marketing penny stocks during his suspension. He *was* (of course) profiting from a business he was forbidden from participating in, but the amount of those profits was relatively low.

*Second*, Kon's scienter. Kon's actions were reckless (but not intentional). Sure, Kon knowingly maintained actual ownership of World Wide—even as he passed off the company's management onto Aguilar. But there's no evidence that he did this because he *intended* to violate the terms of his suspension. At the same time, we agree with the Magistrate Judge that Kon didn't know he was violating the suspension *only* because he failed to consult a lawyer—which was (we don't dispute it) a *reckless* choice, given Kon's history of regulatory trouble and his then-impending suspension. We're left, then, concluding that Kon didn't act willfully *only* because his recklessness prevented him from understanding the implications of his actions.

*Third*, the repeated nature of the violations. This factor's a close call, but we find that it weighs in Kon's favor. The SEC urges us to "treat each separate stock promoted as a separate violation." Motion at 16. We disagree. As the Magistrate Judge correctly explained, "[Kon's] choice to allow Aguilar to operate World Wide on his behalf during the suspension period was a singular decision," which represents one violation. R&R at 17. We also take issue with the SEC's explanation of *how* we

11

should tally "each separate stock promoted[.]" Motion at 16. The SEC contends—without any citations—that "it is fair to infer that each separate payor to Kon represents at least one such stock, and there are at least four such payors." SEC's Reply at 15. And, the SEC continues, "[g]iven the more than 40 separate payments by one of the payors over the course of the entire suspension period, four is undoubtedly an undercount." *Id.* at 15 n.10. We won't base a significant penalty on unadorned inferences or assumptions.

*Fourth*, Kon's failure to admit his wrongdoing. We'll consider this together with the *sixth* factor—his lack of cooperation and honesty with the authorities. These are the two factors that give us the most trouble. On the one hand, Kon entered into a consent judgment, admitted to his suspension violation, and saved the Government (and this Court) the time and expense of protracted litigation and trial. He unquestionably deserves *some* recognition for accepting responsibility in this way. On the other hand, we're troubled by two things Kon did during the life of this case. *One*, Kon forced the SEC to initiate a subpoena-enforcement action, *see SEC v. Kon*, No. 21-mc-23128 (S.D. Fla. Aug. 31, 2021), and then ignored the Court's authority by failing *both* to respond when ordered *and* to appear at a hearing, *see* Order Enforcing Administrative Subpoenas, No. 21-mc-23128 (S.D. Fla. Aug. 9, 2021) (Williams, J.) [ECF No. 9] ("The Court entered the Order to Show Cause [D.E. 4], and Respondent Alexander Kon did not file a written response to the Application and did not appear for the hearing scheduled for September 9, 2021."). *Two*, Kon has said some things in his briefs that suggest he still doesn't believe he did anything wrong. For instance, Kon writes: "Since World Wide continued operating (with no evidence Kon was hiding anything), the *SEC decided* Kon was violating his suspension . . . . The SEC investigated, and rather than fight, Kon settled with the SEC as to liability." Kon's Response to the Motion at 7 (emphasis added). But the SEC didn't *decide* that Kon was violating his suspension; Kon *was*, in fact, violating his suspension. So, we can't say that this statement fully comports with Kon's avowed position that he "acknowledged responsibility for his

actions through agreeing to a consent judgment." Kon's Response to the SEC's Objections at 3. Ultimately, then, we conclude that the fourth and sixth factors stand in equipoise.

*Fifth*, there's no evidence that Kon's conduct created substantial investor losses, so this factor tilts in Kon's favor.

*Seventh* (and finally), we consider "whether the penalty that would otherwise be appropriate should be reduced due to defendants' demonstrated current and future financial condition." *Huff*, 2010 WL 148232, at *4. This factor, too, weighs slightly in Kon's favor. As of September 2022, Kon reported that his "family's total net worth (assets minus liabilities) [was] $162,206," Kon Declaration [ECF No. 30-1] ¶ 17—only $19,106 of which was "liquid and available," *id.* ¶ 20. Kon and his wife have a combined monthly income of around $4,100—but that amount varies because they depend, in large part, on commissions from their network-marketing sales. *Id.* ¶ 21. Moreover, that income is eclipsed by the Kons' monthly expenses, which have traditionally hovered around $5,097, *id.* ¶ 23, but which have (likely) grown because, according to Kon, his mortgage rate became adjustable as of December 2022, *id.* ¶ 25. Plus, given the stigma associated with Kon's multiple SEC violations, we accept that Kon isn't likely to find many lucrative employment opportunities in the near future. We thus agree that Kon's financial condition warrants *some* reduction in his civil penalty.

So, where do the *Huff* factors leave us? Kon's conduct wasn't egregious or intentional, he didn't harm investors, he *did* act recklessly, he's (sometimes) taken responsibility for his actions, and he can't afford a steep fine. These conclusions convince us that the SEC's requested $250,000 is just too much. We simply won't assess that kind of penalty for a violation that—while serious—didn't harm investors. But we also can't swallow Kon's request for a $0 or $5,000 civil penalty, because his conduct was reckless, because he's a repeat offender, and because he (sometimes) seems ambivalent about whether he did anything wrong. We thus agree in principle with the Magistrate Judge that a serious penalty of $50,000, as contemplated by the statute, is appropriate here. That sum represents

13

*less* than 10% of the maximum fine we're empowered to assess, *see* 15 U.S.C. § 78u(d)(3)(B)(ii) (allowing for a civil penalty up to "the gross amount of pecuniary gain"), and is sufficient to punish Kon for his wrong-doing (without being unduly punitive).

At the same time, we disagree with the Magistrate Judge's decision to ignore inflation. Agency fines are, by federal statute, adjusted for inflation. *See* The Federal Civil Penalties Inflation Adjustment Act of 2015, Pub. L. No. 114-74, Sec. 701(b)(1)(D). According to the SEC's 2022 adjustment notice, a $50,000 second-tier penalty under 15 U.S.C. § 78(u)(d)(3), adjusted for inflation in 2022, comes out to $103,591.00. *See* Adjustments to Civil Monetary Penalty Amounts, 87 Fed. Reg. 1808, 1808 (Jan. 12, 2022). So that's what we'll order Kon to pay.

\*   \*   \*

After careful consideration, therefore, we hereby **ORDER AND ADJUDGE** as follows:

1. The SEC's Motion for Entry of Final Judgment [ECF No. 27] is **GRANTED in part**.
2. The R&R [ECF No. 35] is **ADOPTED in part**.
3. Final Judgment is entered in favor of the SEC and against Alexander Kon.
4. Kon shall pay $585,960.00 in disgorgement; $70,508.18 in prejudgment interest; and $103,591.00 as a civil penalty, for which sums execution shall issue.
5. The Clerk of Court shall **CLOSE** this case.
6. All deadlines and hearings are **TERMINATED**, and any other pending motions are **DENIED** as moot.

**DONE AND ORDERED** in the Southern District of Florida on January 13, 2023.

_____
**ROY K. ALTMAN**
**UNITED STATES DISTRICT JUDGE**

cc:   counsel of record

14